# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| Larry Long, individually and on behalf of all others similarly situated, | 1:23-cv-01179 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| The Kroger Co., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.      The Kroger Co. ("Defendant") sells fresh eggs described by in-store labeling as "Positive Farm Fresh," "Farm Fresh" and "Grade A" ("Product" or "eggs").

2.      Findings released by Data for Progress, titled "Cracking Down on Kroger" ("Report") revealed "that Kroger shoppers are being misled into buying eggs from caged hens wrongly thinking they are cage-free."[1]

3.      Data for Progress concluded from its polling that "Kroger customers reveal that the company's marketing of caged chicken eggs is both confusing and misleading, at best."

4.      Relying on the Report, the Michigan Attorney General's Office told Kroger "to add clear signage to your stores to help consumers understand which eggs, exactly, came from caged chickens and which did not, so as to help them be able to make informed choices on how they

---

[1] Letter Re: Kroger Caged Chicken Eggs, Ag No. 2023-0371680-A, Michigan Attorney General Dana Nessel to Rodney McMullen, CEO, The Kroger Co., Mar. 23, 2023 citing Grace Adcox and Julia Jeanty, Data For Progress, "Cracking Down on Kroger," Feb. 2023; AG Press Release, Michigan Department of Attorney General, Department of the Attorney General Sends Letter to Kroger Co. Urging Clear, Truthful Advertising of Cage-Free Eggs, Mar. 31, 2023.

spend their hard-earned dollars. In today's inflationary environment, they deserve at least that."

5.      The "report indicates that Kroger shoppers are being misled into buying eggs from caged hens wrongly thinking they are cage-free."

6.      Michigan's chief law enforcement officer was unambiguous in stating that "Grocery shoppers throughout the state should be able to decipher and trust the advertising in whichever grocer they shop."

7.      This means that "Grocers [like Kroger] must be transparent and honest in their in-store marketing."

8.      The ethical treatment of farm animals is an increasing concern for Americans.

9.      Whereas once small-scale farming produced meat, eggs, and dairy, these foods are sourced from the industrial concentrated animal feeding operation (CAFO) model.

10.     The result has been a decline in animal welfare, food safety, public health, and the environment.

11.     The Report describes how "The majority of the over 300 million hens raised for egg production nationwide are confined in what the industry terms 'battery cages.'"

12.     They are "about the size of a home microwave and confine 6-8 hens throughout their lives."

13.     According to animal behaviorists and welfare organizations, these environments "prevent hens from engaging in critical natural behaviors such as dust bathing, perching, scratching, walking, laying eggs in a nest, and spreading their wings."

14.     Not only is this cruel to the hens, "Food safety, consumer protection, and public health organizations have opposed the caging of egg-laying chickens, citing concerns related to increased risk of salmonella and other diseases."

15. Undercover films disclosing the reality of the largest egg production facilities have generated significant media attention, " creating awareness among the general public and leading to both legislative and corporate action to address these practices across the country."

16. Nine states have already "banned the caging of egg-laying chickens with bipartisan support," with many others adopting anti-caging measures as a result of public ballot measures.

17. Numerous large companies "are already exclusively – or nearly exclusively – using cage-free eggs, like Costco, Nestle USA, Taco Bell, CVS, Walgreens, Whole Foods, Arby's, Aramark, Compass Group, Sodexo, and others."

18. Hundreds of others have made public commitments to exclusively use cage-free eggs by specific future dates, "including McDonald's, Burger King, IHOP, Denny's, Cracker Barrel, Kraft Heinz, and Target."

19. The transition to cage-free egg production "has accelerated rapidly over the last decade in the United States."

20. USDA statistics reveal that "in 2012 the percentage of egg-laying hens that were raised in cage-free housing systems was approximately 5 percent [while] The current rate is roughly 36 percent, due largely to state laws and corporate purchasing policies."

21. If these commitments are met, 75% of hens will be in cage-free environments by 2025.

22. In 2006, Kroger's publicly filed shareholder statement declared that "[its] policies are designed to help to achieve humane treatment of animals,"

23. Kroger's 2011 Sustainability Report "called its commitment to animal welfare 'unwavering.'"

24. In 2016, Kroger "committed that it would switch to only selling cage-free eggs by

2025."

25.    Kroger's 2020 Environmental, Social, and Governance ("ESG") report, which outlines its social responsibility and governance efforts, "affirmed that it was 'on track' to meet its pledge."

26.    However, "just one year later in 2022, Kroger backtracked on its pledge," revealing in its 2022 ESG Report that it "reversed its policy to end use of eggs from caged chickens, claiming slow industry progress and consumers' demand for affordable eggs [were] the main drivers for doing so."

27.    Instead of cage-free eggs, "Kroger now anticipates transitioning only approximately 70 percent of its eggs to cage-free or 'higher standards' by 2030."[2]

28.    Data for Progress stated that "Given Kroger's statements essentially placing the responsibility for its policy backtrack on its consumers, it is worth exploring how the company's customers truly feel about this topic" and "[their] transparency with its customers as to which eggs come from caged chickens."

29.    Though Kroger justified "reneging on its cage-free commitment" because it claimed "consumers make the choice to purchase eggs from caged hens, so [it] company doesn't want to take away that option," the facts show how "the company's marketing of caged chicken eggs is both confusing and misleading, at best."

30.    The Report found "Kroger consumers seem confused and often misled by the marketing of eggs from caged hens using labels like 'Farm Fresh,' and purchase those eggs believing the hens were not confined in cages."

31.    In its study, Data for Progress informed Kroger purchasers how "Some eggs in

---

[2] No further details were provided about what these higher standards would be.

4

grocery stores come from chickens confined in cages [while] Other eggs in grocery stores come from chickens in cage-free facilities where they are not confined in cages, have access to walk and stretch their wings, and at some facilities, have access to the outdoors."

32.   When asked "whether grocers should provide signage to indicate which eggs come from caged chickens and which come from cage-free chickens, a majority of Kroger customers (53 percent) say they would like their grocer to post this signage."

33.   Roughly one-third of customers "said it wouldn't matter either way, while just 12 percent say they would oppose their grocer posting such signage."

34.   Significantly, "women, people under the age of 45, and Black and Latina/o[x] respondents demonstrate stronger support for posting this kind of signage."

35.   Survey respondents "were provided with the labels 'Grade A' and 'Farm Fresh' and asked whether they think these labels refer to eggs that come from chickens confined in cages or chickens not confined in cages, or if they don't know either way."

36.   Though "these labels don't have a relationship with the method by which the chickens that laid them were raised, responses reflect both uncertainty and misperceptions surrounding label meanings."

37.   The "High rates of 'don't know' responses demonstrate this general uncertainty about both 'Grade A' (54 percent) and 'Farm Fresh' (45 percent) labels."

38.   However, over forty percent "of Kroger customers think that the 'Farm Fresh' label indicates eggs that come from chickens not confined in cages, when that is not necessarily the case."

39.   When those customers were added to "nearly as many who say they 'don't know,' the extent of this confusion is clear."

40.     Data for Progress and the Michigan Attorney General agree that "Positive 'Farm Fresh' language misleads many customers."

41.     Finally, Data for Progress analyzed consumers' responses when companies "fail on their [cage-free] promises."

42.     Forty-two percent of "Kroger customers report they would lose trust in their grocery store for reneging on this commitment," with this figure ten percent higher among Latina/o[x] respondents.

<u>Jurisdiction and Venue</u>

43.     Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

44.     The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

45.     Plaintiff is a citizen of Illinois.

46.     Defendant The Kroger Co. is an Ohio corporation with a principal place of business in Cincinnati, Ohio, Hamilton County.

47.     Plaintiff's citizenship is diverse from Defendant's.

48.     The class of persons Plaintiff seek to represent includes persons who are citizens of different states from which Defendant is a citizen.

49.     The members of the classes Plaintiff seek to represent are more than 100, because there are thousands of Kroger stores in the States covered by the proposed classes where millions of Americans shop each day for household staples like eggs.

50.     Venue is in this District with assignment to the Peoria Division because Plaintiff resides in Peoria County and a substantial part of the events or omissions giving rise to these claims

occurred in Peoria County, including Plaintiff's purchase, consumption and use of the Product, reliance on the representations and omissions, and/or subsequent awareness they were false and misleading.

Parties

51.    Plaintiff Larry Long is a citizen of Peoria, Peoria County, Illinois.

52.    Defendant The Kroger Co. is an Ohio corporation with a principal place of business in Cincinnati, Ohio, Hamilton County.

53.    Defendant is the largest grocer in the United States.

54.    Defendant operates thousands of Kroger grocery stores and numerous regional grocery chains in the States covered by Plaintiff's proposed classes.

55.    While Kroger sells leading national brands, it also sells a large number of products under its Kroger private label brands.

56.    Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

57.    Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

58.    Products under the Kroger brand have an industry-wide reputation for quality and value.

59.    In releasing products under the Kroger brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

60.    Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

61.    That Kroger branded products met this high bar was proven by focus groups, which

rated them above the name brand equivalent.

62.  Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

63.  A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

64.  Private label products under the Kroger brand benefit by their association with consumers' appreciation for the Kroger brand as a whole.

65.  The development of private label items is a growth area for Kroger, as they select only top suppliers to develop and produce Kroger-branded products.

66.  These facts show a company with a significant amount of goodwill and equity when it comes to consumer purchasing.

67.  Kroger private label brands include "Simple Truth" and "Kroger."

68.  Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at Kroger locations on Lake Avenue, North Lindberg Drive and/or North Sterling Avenue between June 2020 and the present, among other times.

69.  Plaintiff believed and expected the eggs labeled as "farm fresh" and "Grade A" meant the eggs were from hens that were not confined in cages.

70.  Plaintiff shares the confusion by the large percentage of Kroger customers who were misled by Kroger's in-store labeling of its private label eggs.

71.  Plaintiff seeks to purchase eggs from hens not confined in cages because he believes it is inhumane to the hens, harmful to the environment and potentially a source of foodborne illness.

72.  Plaintiff relied on the words, terms coloring, descriptions, layout, placement,

packaging, tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

73.     As a result of the false and misleading representations, the Product is sold at premium price, approximately not less than $2.29 per 12 eggs, excluding tax and sales.

74.     Plaintiff bought the Product at or exceeding the above-referenced price.

75.     Plaintiff paid more for the Product, would have paid less or not have purchased it had he known the representations and omissions were false and misleading.

76.     The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

77.     Plaintiff is like the "Kroger customers surveyed [who] report they also shop at the brand's major competitors, reflecting increased competition for consumers in the grocery sector."

78.     Plaintiff is less likely to purchase items at Kroger going forward than if it did not renege on its commitment to cage-free eggs.

79.     Plaintiff chose between this Product and others represented similarly, but which did not misrepresent or omit their attributes, requirements, instructions, features, and/or components.

80.     Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance its representations are consistent with its abilities, attributes, and/or composition.

81.     Plaintiff is unable to rely on the labeling and representations not only of this Product, but other natural cough treatments, because he is unsure whether those representations are truthful.

82.     If Defendant's labeling were to be truthful, Plaintiff could rely on the labeling of

other eggs described as "cage-free."

Class Allegations

83.    Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Arkansas, Montana, Wyoming, Utah, Idaho, Iowa, West Virginia and Alaska who purchased the Product during the statutes of limitations for each cause of action alleged.

84.    Common questions of issues, law, and fact predominate and include whether Defendant's representations and omissions were and are misleading and if Plaintiff and class members are entitled to damages.

85.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

86.    Plaintiff is an adequate representative because his interests do not conflict with other members.

87.    No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

88.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

89.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

90.    Plaintiff seeks class-wide injunctive relief because the practices continue.

Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, <em>et seq.</em>

<u>(Illinois Class)</u>

91.   Plaintiff incorporates by reference all preceding paragraphs.

92.   Plaintiff expected the Kroger eggs with in-store and other labeling as "Grade A" and "Farm Fresh" meant they were from hens that were not confined in cages.

93.   Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u><br><u>(Consumer Fraud Multi-State Class)</u>

94.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

95.   The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

96.   Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

<u>Breaches of Express Warranty,</u><br><u>Implied Warranty of Merchantability/Fitness for a Particular Purpose</u><br><u>and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <i>et seq.</i></u>

97.   The eggs were produced, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that they were from hens that were not confined in cages.

98.   Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions, and targeted digital advertising.

99.   Defendant knew the product attributes that potential customers like Plaintiff were

11

seeking, such as eggs from hens not confined in cages and developed its marketing and labeling to directly meet their needs and desires.

100. The representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the eggs were from hens not confined in cages.

101. Defendant's representations affirmed and promised that the eggs were from hens not confined in cages.

102. Defendant described the Product so Plaintiff believed that the eggs were from hens not confined in cages, which became part of the basis of the bargain that it would conform to its affirmations and promises.

103. Defendant had a duty to disclose and/or provide non-deceptive promises, descriptions and marketing of the Product.

104. This duty is based on Defendant's outsized role in the market for groceries, custodian of the Kroger name and Kroger and Simple Truth brands, known for quality and honesty.

105. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

106. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

107. Defendant received notice and should have been aware of these issues due to complaints by consumers and third-parties, including the Michigan Attorney General and Data for Progress, and including regulators and competitors, to its main offices and through online forums.

108. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

109. The Product was not merchantable because it was not fit to pass in the trade as

advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if they were from eggs from hens not confined in cages.

110.   The Product was not merchantable because Defendant had reason to know the particular purpose for which it was bought by Plaintiff, because he expected they were from eggs from hens not confined in cages, and he relied on its skill and judgment to select or furnish such suitable product.

<u>Negligent Misrepresentation</u>

111.   Defendant had a duty to truthfully represent the Product, which it breached.

112.   This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the custodian of the Kroger and Simple Truth brands, relied on for decades by the public.

113.   Defendant's representations regarding the Product went beyond the specific representations on its packaging and labels, as they incorporated its extra-labeling promises and commitments to quality Kroger has been known for.

114.   These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

115.   The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

116.   Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, his purchase of the Product.

<u>Fraud</u>

117.   Defendant misrepresented and/or omitted the attributes and qualities of the Product,

that they were from hens not confined in cages.

118.  Defendant was aware of how consumers were misled by its in-store and other labeling for its eggs, and that consumers wanted more clear information about the conditions of the hens which produced the eggs.

119.  The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

<u>Unjust Enrichment</u>

120.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1. Certifying Plaintiff as representative and the undersigned as counsel for the classes;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary, statutory and/or punitive damages and interest;

4. Awarding costs and expenses, including reasonable attorney and expert fees; and

5. Other and further relief as the Court deems just and proper.

Dated:   May 3, 2023

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021

(516) 268-7080
spencer@spencersheehan.com